MINNESOTA FEDERATION OF TEACHERS on behalf of their organization and members; Richard M. Mans, President Minnesota Federation of Teachers, Taxpayer, Plaintiffs,

v.

Thomas A. NELSON, Commissioner of the Minnesota Department of Education, et al., Defendants.

Civ. No. 4–87–211.

United States District Court, D. Minnesota, Fourth Division.

July 2, 1990.

Roger A. Peterson, Ron Marks, and Peterson, Engberg & Peterson, Minneapolis, Minn., for plaintiffs.

Cindy L. Lavorato, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendants Com'r of Educ. and President of the State Bd. of Educ.

Robert J. Sheran, James P. McCarthy, and Lindquist & Vennum, Minneapolis, Minn., for defendants Bethel College, Concordia College Moorhead, Augsburg College, St. John University, College of St. Catherine, Hamline University and Macalester College.

R. Scott Miller, Jr., Volunteer Atty. for Amicus Minnesota Civil Liberties Union, St. Paul, Minn. and Judith A. Cook, Minnesota Civil Liberties Union, Minneapolis, Minn.

## ORDER

DOTY, District Judge.

This matter is before the court on the remaining parties' cross-motions for summary judgment. Based on the briefs and arguments of counsel, and the record, file and proceedings herein, defendants' motion will be granted in part and denied in part and plaintiff Richard Mans' motion will be denied.[1]

## BACKGROUND

Plaintiff brings this action as a taxpayer challenging the constitutionality of the Post–Secondary Enrollment Options Act, Minn.Stat. § 123.3514 (1988 and Supp.1989) (the "Act" or "PSEOA"), on the grounds that it violates the establishment clause of the first amendment. The Act provides eleventh and twelfth grade secondary school students with the opportunity to obtain high school credit by taking courses at an "eligible institution." The purpose of the Act is "to promote rigorous academic pursuits and to provide a wider variety of options to high school pupils by encouraging and enabling secondary pupils to enroll full-time or part-time in non-sectarian courses or programs in eligible post-secondary institutions." § 123.3514, Subd. 2. An "eligible institution" is defined as "a Minnesota public post-secondary institution or a private, residential, two-year or four-year, liberal arts, degree-granting college or university located in Minnesota." § 123.3514, Subd. 3. A student participating in the program need not pay the institution for credits earned and applied towards secondary school graduation requirements. § 123.3514, Subd. 7. The state, through the Department of Education, must reimburse the institution for the credits under a formula provided for in the statute. *See* § 123.3514, Subd. 6. The amount paid to the institution is subtracted from the general education aid paid to the pupil's resident educational district. *Id.* From 1985 to 1989, an average of 93.8 percent of students participating in the program have chosen to attend public institutions. (Affidavit of Jesse W. Lewis at 4a).

Eight colleges and universities ("CUs") who have accepted students under the program remain defendants in this case. Each

---

1. Plaintiff Minnesota Federation of Teachers has been dismissed from this case for lack of standing. *Minnesota Federation of Teachers v.* *Randall,* No. 4–87–211, slip. op. at 9 (D.Minn. March 1, 1988), *rev'd on other grounds,* 891 F.2d 1354 (8th Cir.1989).

of the defendant's presidents have submitted affidavits which can be summarized, to the extent they are similar, as follows:

(1) the institutions, excepting Bethel College, admit PSEOA and non-PSEOA students without regard to creed;

(2) the institutions make no attempt to indoctrinate or proselytize PSEOA or non-PSEOA students;

(3) the institutions do not enforce adherence to a religious dogma by PSEOA students or by non-PSEOA students;

(4) the institutions do not require PSEOA students, non-PSEOA students, faculty, administration or staff to attend religious services or exercises;

(5) none of the institutions have a policy encouraging professors to start each class with a prayer;

(6) the institutions admit high school students pursuant to the PSEOA only if they demonstrate academic excellence and personal maturity through their high school record, activities and personal references;

(7) the institutions follow the 1940 Statement of Principles on Academic Freedom of the American Association of University Professors and in accordance with those principles all courses are taught according to the academic requirements which are intrinsic to the subject matter, and the individual teacher's concept of professional standards;

(8) the institutions do not permit PSEOA students to take religion or theology courses;

(9) neither the structure of courses nor content of subjects taught at the institutions is controlled by the church or denomination affiliated with the respective institution.[2]

■ The court need not consider the characteristics of defendant Northwestern Bible College for purposes of the instant motions. The court has been informed by the parties that an agreement to dismiss Northwestern from this case has been reached and that one of the requirements of that agreement is that Northwestern cease accepting any students under the PSEOA program at least until such time as the statute is upheld as constitutional. Although plaintiff argued during the hearing on this motion that Northwestern should be considered for the present motion on the grounds that Northwestern may at some future time again accept students under the program, the court concludes that plaintiff's claim involving Northwestern is now moot. If Northwestern does again accept students under the program, plaintiff may renew his claim against Northwestern at that time.

In his memorandum in support of his summary judgment motion, plaintiff identified a number of characteristics of the CU's which the court finds both undisputed, except as indicated below, and relevant to the instant motions.

Defendant Macalester College ("Macalester") is affiliated with the Presbyterian (USA) Church. (Affidavit of Roger G. Marks, Exh. 19, p. 5). Macalester's prospectus provides in pertinent part that: "Church-college ties are still strong, still meaningful today. The values which underlie Macalester's century-long traditions are drawn directly from its heritage. *But from the beginning, Macalester has been a college that fosters spiritual growth among people of many religions and beliefs; all are welcome.*" *Id.* (emphasis added). Faculty hiring decisions are not based on religion. (Affidavit of Robert Gavin, Jr., at para. 8). No classes taken by PSEOA students are started with a prayer. *Id.* at para. 12. The college's classrooms do not contain any religious symbols or images. *Id.* Macalester receives no funds from the Presbyterian Church. (Macalester's Answer to Interrogatory No. 5). Two

---

**2.** (Affidavit of Charles S. Anderson, President of Augsburg College; Affidavit of George K. Brushaber, President of Bethel College; Affidavit of Anita Pampusch, President of the College of St. Catherine; Affidavit of Terrence J. Murphy, President of the College of St. Thomas; Affidavit of Paul J. Dovre, President of Concordia College; Affidavit of Larry G. Osnes, President of Hamline University; Affidavit of Robert M. Gavin, Jr., President of Macalester College; Affidavit of Hilary Thimmesh, President of St. John's University) [hereinafter "President's Affidavits"].

of Macalester's trustees, officers or deans are ordained ministers. *Id.* No. 10. There is no requirement that any of its governing board members be Presbyterian. *Id.* No. 11. One of the thirty-two trustees is a church official. Six ordained ministers are on Macalester's payroll. *Id.* No. 13. Faculty are hired and promoted regardless of creed. *Id.* No. 14. There is no prohibition against wearing religious garb at Macalester. *Id.* No. 25.

Defendant Hamline University ("Hamline") is affiliated with the United Methodist Church. Hamline has a commitment to maintain a strong tie with the United Methodist Church. (Affidavit of Roger G. Marks, Exh. 20, p. 5). Commencement exercises at Hamline include invocations and benedictions. *Id.*, Exh. 9. Faculty hiring decisions at Hamline are not made on the basis of the applicant's religion. (Affidavit of Larry Osnes at para. 9). Hamline received $41,995.04 from the Methodist Church during 1985–86. (Hamline Answer to Interrogatory No. 5). Twelve of Hamline's officers, deans or trustees are ordained ministers. *Id.* No. 10. Twelve of the forty-six governing trustees are church officials. *Id.* No. 11. Three Methodist ministers, one Jewish Rabbi, and one Presbyterian minister are on Hamline's payroll. *Id.* No. 13. Classrooms do not contain religious symbols. *Id.* No. 16. Hamline has no church or chapel buildings on campus. There is a chapel lounge in the student center building used as a multipurpose room. *Id.* No. 20. There is no prohibition against wearing religious garb at Hamline. *Id.* No. 25.

Defendant Augsburg College ("Augsburg") is a four-year liberal arts college of the American Lutheran Church. (Affidavit of Roger G. Marks, Exh. 10, p. 1.1.1) Augsburg's catalog for 1984 to 1986 provides that "[t]he mission of Augsburg College is to educate students through a distinctive combination of commitment to the christian faith, the liberal arts and excellence in academic program." *Id.*, Exh. 21, p. 3. For over 100 years, Augsburg has emphasized intellectual freedom. *Id.* "Education at Augsburg is based on the belief that the world is God's entrusted to us for care,

exploration and understanding." *Id.* The Augsburg College Faculty Handbook provides in pertinent part that:

> Augsburg is a liberal arts college utilizing the resources of its urban location to prepare persons with leadership potential to serve, in the spirit of Jesus, the human needs of a changing society.
>
> . . . .
>
> [This] means that the goal of Augsburg is to produce graduates who will utilize their education for genuine service to human kind, and that this service will be rendered in the spirit of Jesus, which spirit hopefully inspires and permeates the life of the college as an institution owned and supported by a christian community.

*Id.*, Exh. 10, p. 1.0.1. Faculty members are expected to be sympathetic to the purposes and goals of Augsburg. *Id.*, p. 9.0.3.

> This does not mean that a prospective appointee should be excluded on the basis of his religious commitment, but that minimally, the faculty member affirmatively accept the propriety of the tasks which the college has set for itself and participate agreeably within the milieu of this christian heritage and philosophy.

*Id.; see also* Answer to Interrogatory No. 14 ("faculty qualifications do not include a particular religious affiliation"). Augsburg's commencement program includes an opening hymn, brief order for confession and forgiveness, recitation of the christian creed, bible readings, a "baccalaureate sermon," recitation of the Lord's Prayer, a benediction, a closing prayer, and a closing hymn. *Id.*, Exh. 11.

Defendant College of St. Thomas ("St. Thomas") is affiliated with the Roman Catholic Church and is a Diocesan college. Catholicism encompasses both curricular and non-curricular matters. (Affidavit of Ronald G. Marks, Exh. 15, p. 5). Religious symbols can be found on the college campus and in some classrooms. Instructors may teach courses wearing religious garb. (St. Thomas' Answers to Interrogatories 16, 25). Student commencement exercises at St. Thomas include invocations and

blessings. (Affidavit of Ronald G. Marks, Exh. 1). The Archdiocese of Minneapolis and St. Paul does not control the course structure or content of subjects taught at St. Thomas. (Affidavit of Terrence J. Murphy at para. 12). Five Catholic priests are officers, trustees or deans of the college. (St. Thomas' Answer to Interrogatory No. 4). Thirteen percent of the college's governing board are church officials. *Id.* at No. 5. Forty-three Catholic priests, brothers or sisters are on the college payroll. The record does not indicate which of these are faculty members or what percentage of faculty members are priests, brothers or sisters. The Roman Catholic Church does not provide any scholarship funds for students. *Id.* at No. 8.

Defendant St. John's University ("St. John's") is also affiliated with the Roman Catholic Church. St. John's 1984 to 1986 catalog provides the following mission statement:

> St. John's University was founded by Monks of the Order of St. Benedict and continues to be sponsored by St. John's Abbey. The mission of the university, described simply in the 1857 charter as "the education and instruction of youth," takes its particular character from certain principles hollowed in the Benedictine rule and tradition.
>
> The monastic tradition embodies a fundamental respect for learning and the intellectual and spiritual quest for truth. This tradition reinforces our primary commitment to the cultivation of intelligence and creativity through study and understanding of the liberal arts. By this emphasis St. John's aims to foster free intellectual inquiry, knowledge of human history and culture and clear thinking, speaking and writing.
>
> Inherent in Benedictine tradition is a respect for work which expresses the individual talent and serves the good of the community. We believe strongly in building a sense of human interdependence and view academic preparation for work in the arts, business, the professions and public service as preparation to take part in contemporary life and to exert leadership in the great social and moral issues of our time. St. John's seeks to create an environment for learning which draws its deepest inspiration from a desire for the truth, for justice, for charity. As an institution conducted under Roman Catholic auspices we encourage students to view their lives as God-given. We provide opportunities for theological study, for liturgical worship, for personal counsel and for sharing in a wide range of group activities addressed to social and religious concerns.... The Benedictine view of life is integrative, not separating intellectual from moral excellence or individual from social development but finding personal fulfillment through sharing in the life of the community.
>
> ....
>
> Recognition of individual worth without regard for wealth or social standing is explicit in the rule of Benedict. In harmony with this principle, St. John's University seeks to exemplify an authentically Christian concern for human rights and to make education broadly available to students on the sole criterion of ability to benefit from enrollment in the university. While St. John's seeks first to serve its own region, it welcomes students and teachers from diverse cultures and regions, seeking in this way to serve a national and international community.

(Affidavit of Ronald G. Marks, Exh. 16, p. 2).

Religious symbols exist at St. John's in some classrooms. (St. John's Answer to Interrogatory No. 16). Commencement exercises include an invocation, blessing, and a morning mass. (Affidavit of Ronald G. Marks, Exh. 3). Seventy-five members of the Order of St. Benedict are on St. John's payroll. (St. John's Answer to Interrogatory No. 3). Faculty hiring decisions are not made on the basis of the applicant's religion, except as to the graduate school in theology, and the theology department in the college (a chair in the Jewish studies department must be filled by a Jewish Rabbi), and except that there is a preferential hiring policy for monks of the Order of St.

Benedict. (Affidavit of Hilary Thimmesh at para. 9). The president, vice president for student affairs, assistant to the president and corporate treasurer are all monks. (St. John's Answer to Interrogatory No. 10). Almost one-third of the governing board are monks. *Id.* at No. 11.

Defendant College of St. Catherine ("St. Catherine") is also affiliated with the Roman Catholic Church. The preamble to St. Catherine's faculty constitution states that the college is owned and operated by the Sisters of St. Joseph of Carondelet. (Affidavit of Ronald G. Marks, Exh. 4, p. 2).

> St. Catherine ... is a catholic liberal arts college for women. The college seeks to promote an atmosphere of intellectual openness and discernment in which an ongoing search for truth is undertaken, and a refinement of the ability to evaluate alternatives faced in a pluralistic society can be achieved.
>
> The Judeo–Christian heritage and its fulfillment in the gospel of Jesus Christ is emphasized as a key to understanding each person's relationship to God and to one another. The college offers students of all faiths the experience of a believing community. It creates an atmosphere supportive of religious values and provides opportunities for worship. As an institution, the college encourages its faculty, staff and students to respond with justice and charity to the needs of others both within and outside the college community.

*Id.* The faculty handbook for St. Catherine provides in pertinent part that:

> Recruitment of members of the congregation of the Sisters of St. Joseph of Carondelet is considered desireable and even essential to the maintenance of an institution fully supportive and expressive of the college's distinctive mission and sponsorship. In actual hiring, members of the congregation who apply are screened to determine qualification; all factors being equal, such applicants would be favored.

*Id.*, Exh. 5, p. 28–1.

Religious symbols exist on the campus of St. Catherine and are found in some classrooms but not in classrooms where PSEOA students attend classes. (St. Catherine's Answer to Interrogatory No. 16; Affidavit of Anita Pampusch at para. 16). Instructors at the college may wear religious garb while giving instruction. (St. Catherine's Answer to Interrogatory No. 25). Commencement exercises at St. Catherine's also include invocations and benedictions. (Affidavit of Roger G. Marks, Exh. 6).

Defendant Concordia College ("Concordia") is a college of the American Lutheran Church. (Affidavit of Roger G. Marks, Exh. 18, p. 7). Concordia's general catalog for 1985 to 1987 provides that:

> The purpose of Concordia College is to influence the affairs of the world by sending into society thoughtful and informed men and women dedicated to the christian life.
>
> Concordia is a liberal arts college of the church. As an institution of higher education, it seeks to enable students to develop as thinking, feeling, ethical human beings. A Concordia education encourages students to discover their interests, prepare for their careers, and acquire tools and motivation for a lifelong process of learning. As a college of the church, Concordia seeks to equip students with the knowledge, methods, attitudes and discipline needed for a lifetime of service to God and others.
>
> . . . .
>
> The historic liberal arts education endeavors to impart to students a workable philosophy of life and to give them the best possible education for life, no matter what professions or vocations are selected. The broad knowledge, penetrating insight, sense of evaluation, self-discipline and ability to make adjustments, which come through a liberal education, are ingredients of leadership in every worthy field of endeavor.
>
> *The integrating element for the curriculum in life in the liberal arts college of the church is the revelation of God in Jesus Christ.* We confess that, in Christ, God is disclosed to humanity with love, forgiveness and grace and that he now calls us to faith by his Spirit.

*This concept of our shared life in Christ holds vital implications for Concordia. It means more than the college's offering courses in religion or having a daily chapel service, although these are important features of Concordia. Rather, it involves the entire program of the college, for all life is to be viewed under the lordship of Jesus Christ. Considering education in the light of Christ, there can be no division between sacred and secular subjects.*

*Id.* at p. 8 (emphasis added).

Membership on the board of regents of Concordia is governed by the Articles of Incorporation and By-laws. At least 15 of the "not fewer than twelve (12), nor more than twenty-six (26)" board members must be members of the American Lutheran Church. (Concordia's Answer to Interrogatory No. 11). Concordia received $283,933 in 1984–85 from the American Lutheran Church for its general operations. *Id.* No. 5.

Twelve ordained ministers are on Concordia's payroll. *Id.* No. 13. Classrooms do not contain religious symbols. *Id.* No. 16. Concordia does not have a church or chapel on campus, but instead uses a multipurpose room for chapel service. *Id.* No. 20. Periodic church conventions, an annual theological conference and an annual Faith, Reason and World Affairs symposium meet on campus. *Id.* No. 22. Concordia does not have a policy requiring or encouraging professors to start each class with a prayer. (Affidavit of Paul Dovre at para. 13).

Defendant Bethel College ("Bethel"), is a department of the Baptist General Conference. Bethel's undergraduate population is committed to the concept of learning as a tool in expressing God's glory. (Bethel's Admissions of the Genuineness of Documents and Exhibits, Exh. Z). One of the Baptist General Conference's missions is " 'to maintain, operate and conduct Christ-centered schools for the education of young people, and to maintain a seminary for the training of those called into the gospel ministry and into missionary service'.... Bethel is church owned and operated." *Id.*, Exh. W, p. I–2.

In order to be admitted for the PSEOA program for the 1985–86 school year at Bethel, a student had to answer yes to "do you consider yourself a christian" and agree to live by the Bethel lifestyle statement. *Id.*, Exh. C–1; *but see* Affidavit of George K. Brushaber at para. 15 ("Both PSEOA and non-PSEOA students are admitted without regard to denominational affiliation or sectarian creed"). All Bethel students are encouraged to maintain a regular pattern of personal bible study and prayer. *Id.*, Exh. J–1. Exhibit J–1 is a document which describes the community life requirements at Bethel College, and Bethel has admitted its genuineness. Exhibit J–1 provides in part that:

Historically, Bethel and its constituency have been characterized by a conservative lifestyle. This has led to an emphasis upon refraining from practices common in our time but expressly forbidden in the bible such as sexual relationships outside of marriage, homosexuality, drunkenness, theft, dishonesty and disobedience to the state except in those rare instances that violate a biblically-informed conscience. Voluntary self-discipline is stressed at Bethel and rules are kept to a minimum. *However, certain practices have been found to be detrimental to the common good at Bethel including* ... tobacco in any form; ... the improper use of ... social dancing ... and indiscriminate participation in the theatre or card games. *All members of the Bethel community are required to abstain from these practices both on and off the campus.*

*Id.* at 51 (emphasis added).

Exhibit W is entitled "Community Commitments, Administrative–Faculty Handbook" and provides in part that:

Faculty members must also be scholars.... The *sine qua non* of the educational philosophy of Bethel is the commitment to the integration of faith and learning. We believe that biblical perspectives help to shape and enrich learning. As the scholars at Bethel pursue the integration of faith with learning they will seek:

1. To embody and exemplify such christian virtues as intellectual integrity, commitment to excellence, compassion, humility and tolerance;

2. To allow biblical perspectives to shape, correct and enrich the content and practice of one's discipline and educational theories;

3. To develop a world view which comports well with their christian beliefs.

In the college candidates for tenure will be required to submit a paper detailing their understanding of the relevance of the christian faith to their fields of teaching.

*Id.*, Exh. W, p. III–21 to III–22. Concurrence with the major articles of the college's "affirmation of faith" is expected for full-time appointment to the faculty. (Bethel's Answer to Interrogatory No. 14; *but see* Affidavit of George K. Brushaber, para. 9 ("faculty hiring decisions at Bethel are not made on the basis of sectarian criteria or the applicant's denominational affiliation")).

Bethel College received $348,000 in fiscal year 1985–86 from the Baptist General Conference. (Bethel's Answer to Interrogatory No. 5). Ten of Bethel's trustees, deans or officers are ordained ministers. *Id.* at No. 11. All of Bethel's regents are required to be members of the Baptist General Conference Churches. *Id.* No. 11. Each regent is required to be an active member of a Baptist Church. *Id.* No. 12. Ten ministers are on Bethel's payroll. *Id.* No. 13. Classrooms at Bethel do not contain religious symbols. *Id.* No. 16. There is neither a requirement nor a prohibition regarding wearing religious garb at Bethel. *Id.* No. 25.

Plaintiff contends that the fact funds flow from the state to the defendant CUs under the PSEOA program violates the establishment clause of the first amendment of the United States Constitution, and that he is entitled to summary judgment based on that fact. Defendants respond that under the interpretation of the establishment clause contained in numerous Supreme Court opinions, the PSEOA does not violate that clause and they are entitled to summary judgment.

## DISCUSSION

Summary judgment is appropriate where the pleadings and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The facts presented on a motion for summary judgment must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (citing *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970)). The non-moving party, however, may not rest on his pleadings. He must set forth specific facts, by affidavit or otherwise, which show the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510.

The command of the first amendment of the United States Constitution that "Congress shall make no law respecting an establishment of religion" is applicable to the states through the due process clause of the fourteenth amendment. *Everson v. Board of Education*, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947). The United States Supreme Court has visited the issue of the constitutionality of a federal or state funding statute which at some point resulted in public funding arriving in the coffers of a religiously affiliated institution on twenty occasions. *See Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); *Witters v. Washington Department of Services for the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Grand Rapids School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985); *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); *Committee for Public Education and Religious Liberty v. Re-*

*gan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Americans United for the Separation of Church and State v. Blanton,* 434 U.S. 803, 98 S.Ct. 39, 54 L.Ed.2d 65 (1977) *summarily aff'g,* 433 F.Supp. 97 (M.D.Tenn.1977); *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Roemer v. Maryland Public Works Board,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Sloan v. Lemon,* 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Committee of Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Levitt v. Committee for Public Education,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Waltz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cochran v. Louisiana State Board of Education,* 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930). A majority of the cases upheld the constitutionality of the particular funding statute at issue. On eight occasions the Court has held the funding program unconstitutional. *See Aguilar,* 473 U.S. at 414, 105 S.Ct. at 3239; *Grand Rapids,* 473 U.S. at 398, 105 S.Ct. at 3230; *Wolman,* 433 U.S. at 262, 97 S.Ct. at 2613; *Meek,* 421 U.S. at 373, 95 S.Ct. at 1767; *Sloan,* 413 U.S. at 835, 93 S.Ct. at 2988; *Nyquist,* 413 U.S. at 798, 93 S.Ct. at 2978; *Levitt,* 413 U.S. at 482, 93 S.Ct. at 2820; *Lemon,* 403 U.S. at 625, 91 S.Ct. at 2117. Since 1971, the Court has analyzed each statute under a three part test established in *Lemon v. Kurtzman,* 403 U.S. at 612–13, 91 S.Ct. at 2111 to determine the constitutionality of a challenged statutory scheme. That test requires the Court to examine first, whether the statute has a secular purpose, second, whether the statute has the effect of advancing religion and third, whether it creates an excessive en-

tanglement with religion. An affirmative finding as to any of those characteristics leads to a finding that the statute violates the Constitution. In the Court's most recent funding opinion it applied the *Lemon* test first to the words of the statute and then as it is applied. *See Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). Consistent with that analysis, this court will proceed to consider the constitutionality of the PSEOA.

## I. Facial Validity of the PSEOA

 The PSEOA is facially constitutional. Similar to the program considered in *Bowen,* on its face the Act is not motivated wholly by an impermissible purpose, does not have the primary effect of advancing religion, and does not require excessive entanglement between church and state. *See Bowen v. Kendrick,* 108 S.Ct. at 2578.

### A. Purpose

The PSEOA's purpose "is to promote rigorous academic pursuits and to provide a wider variety of options to high school pupils by encouraging and enabling secondary pupils to enroll full-time or part-time in nonsectarian courses or programs in eligible post-secondary institutions...." Minn. Stat. § 123.3514, subd. 2 (1988 and Supp. 1989). Plaintiff concedes, and the Court finds, that this purpose is sufficiently secular to avoid the first prong of the *Lemon* test.

### B. Effect

As is typically the case, consideration of the second prong of the *Lemon* test is more difficult. *See Bowen,* 108 S.Ct. at 2571. Plaintiff presents three arguments to support his contention that, on its face, the Act has the primary effect of advancing religion.

#### 1. Limited Indirect Funding

First, plaintiff contends that the PSEOA has the primary effect of advancing religion because it constitutes direct state aid to religiously affiliated institutions without secular purpose limitations on the use of funds. This argument must fail. The funds provided to CUs under the PSEOA

are neither without limitations nor fairly considered to be direct state aid.

The statute expressly limits payment of state funds to payment for course credits taken for secondary credit by eleventh and twelfth grade students. Section 123.3514, subd. 6. Participating institutions are paid for nothing other than services rendered by them under the statute and the statute limits those services to "nonsectarian courses or programs." Section 123.3514, Subd. 2. In fact, on average, the defendant CUs received reimbursement for only 53.05 percent of the actual costs of tuition, textbooks, materials and fees for PSEOA students during the 1988–89 school year. (Etheridge Affidavit at para. 4). At all of the CUs the amount of reimbursement received from the state is less than the actual instructional charges for courses attended by PSEOA students. (Presidents' Affidavits, *supra* note 2). In 1988–89 alone, over $242,042 in costs incurred by the CUs were not reimbursed by the state. (Etheridge Affidavit at para. 4). Under these circumstances, money received under the PSEOA by church affiliated CUs can hardly be considered without limitations. Not only is the payment of funds limited by the course credits taken, but application of the statutory formula permits the state to obtain educational services at a significantly reduced price.

The tuition reimbursement payments made under the PSEOA cannot fairly be described as direct grants to CUs. "The question in each case … whether the effect of the proffered aid is 'direct and substantial,' or indirect and incidental … is one of degree." *Grand Rapids School District v. Ball,* 473 U.S. 373, 394, 105 S.Ct. 3216, 3228, 87 L.Ed.2d 267 (1985) (citations omitted). While the tuition reimbursements are directly paid to the CUs, the explicit purpose of the statute is to provide post-secondary educational opportunities to eleventh and twelfth grade students, not to provide funding to church affiliated CU's. On its face the statute neutrally defines institutions eligible to participate in the program. Both public and private Minnesota CU's may participate. § 123.3514, Subd. 3. In the four

years of the program's operation, over 93 percent of the institutions chosen by students are public; 86.66 percent of the total funds paid to institutions went to public institutions. (Affidavit of Jesse W. Lewis at 4a). It is the student's choice of which CU to attend that determines the flow of funds from the state to the religiously affiliated CUs under the PSEOA. "[S]tate programs that are wholly neutral in offering educational assistance to a class defined without reference to religion do not violate the second part of the *Lemon v. Kurtzman* test, because any aid to religion results from private choices of individual beneficiaries." *Witters v. Washington Department of Services for the Blind,* 474 U.S. 481, 490, 106 S.Ct. 748, 753, 88 L.Ed.2d 846 (1985). Justice Powell stated this rule in his concurring opinion in *Witters.* Justices Rehnquist, White, Burger and O'Connor all joined in that statement. *See id.* at 490–93, 106 S.Ct. at 753–55. Those five justices made up the majority opinion in *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), written by Justice Rehnquist, which established the "neutrality" rule relied on in *Witters. See id.* at 397–399, 103 S.Ct. at 3068–3069.

Plaintiff's reliance on *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and *Committee of Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), to support his contention that the aid in this case constitutes direct state aid is misplaced. In both cases the statutes which the Court held to be direct state aid provided funding *only* to *non public* schools. *See Lemon,* 403 U.S. at 606–07, 91 S.Ct. at 2108–09; *Nyquist,* 413 U.S. at 762, 764, 93 S.Ct. at 2960, 2961. Students receiving benefits under the statutory funding programs at issue in *Lemon* and *Nyquist,* therefore, could not choose, as the students can under the PSEOA, to apply those benefits to public schools. It is the intervening choice provided to students under the PSEOA, coupled with the fact that over 93 percent of the students exercising that choice actually choose public schools, which renders the PSEOA an indirect funding statute.

As the court stated in *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1973):

> [T]his case is vitally different from the scheme struck down in *Nyquist.* There, public assistance amounting to tuition grants was provided only to parents of children in *nonpublic* schools. This fact had considerable bearing on our decision striking down the New York statute at issue.... [B]y channeling whatever assistance it may provide to parochial schools through individual parents, Minnesota has reduced the Establishment Clause objections to which its action is subject.... [U]nder Minnesota's arrangement public funds become available only as a result of numerous private choices of individual parents of school age children.... *Nyquist* ... is distinguishable from this case.... Where ... aid to parochial schools is available only as a result of decisions of individual parents no "imprimatur of state approval," can be deemed to have been conferred on any particular religion, or on religion generally.

*Id.* at 398–99, 103 S.Ct. at 3068–69 (citations omitted) (emphasis in the original).

### 2. Funding to Pervasively Sectarian Organizations

■ Plaintiff next argues that the PSEOA has the primary effect of advancing religion because it provides aid to pervasively sectarian institutions. This argument must also fail. As stated above, *Witters* confirms that where a statute neutrally provides assistance to a class defined without reference to religion, and where any aid ultimately flowing to a religion results from the private choices of individual beneficiaries, the statute will not violate the second part of the *Lemon* test regardless of the sectarian nature of the institutions ultimately receiving the funds. *Witters,* 474 U.S. at 490, 106 S.Ct. at 753; *Mueller,* 463 U.S. at 399, 103 S.Ct. at 3069.

■ Even if the PSEOA could be considered to directly fund CU's, the Court's opinion in *Bowen* establishes that the PSEOA considered on its face passes mus-ter under the effects prong of the *Lemon* test. Outside of primary and secondary schools, religious institutions that receive public funds on a neutral basis are presumed not to be pervasively sectarian. *Bowen v. Kendrick,* 108 S.Ct. at 2573–2575. "[W]e do not think the possibility that ... grants may go to religious institutions that can be considered 'pervasively sectarian' is sufficient to conclude that no grants whatsoever can be given under the statute to religious organizations." *Id.* at 2575. As with the federal statute at issue in *Bowen,* the PSEOA is facially neutral in providing grants to both public and private institutions. A wide spectrum of public and private institutions are capable of meeting the PSEOA's requirements, and, as the analysis below regarding the pervasive sectarian nature of the instant defendants demonstrates, most do not deserve the label "pervasively sectarian." *See id.*

### 3. Symbolic Link

Finally, plaintiff argues that the PSEOA violates the primary effect prong of the *Lemon* test by creating a symbolic union of church and state which conveys a clear message of endorsement of religion by the state to impressionable secondary school students. The Court's opinion in *Bowen* forecloses this argument also:

> As yet another reason for invalidating parts of the [funding statute], the district court found that the involvement of religious organizations in the Act has the impermissible effect of creating a "crucial symbolic link" between government and religion. If we were to adopt the district court's reasoning, it could be argued that any time a government aid program provides funding to religious organizations in an area in which the organization also has an interest, an impermissible "symbolic link" could be created, no matter whether the aid was to be used solely for secular purposes. This would jeopardize government aid to religiously affiliated hospitals, for example, on the ground that patients would perceive a "symbolic link" between the hospital—part of whose "religious mission" might be to save lives—and what-

ever government entity is subsidizing the purely secular medical services provided to the patient. We decline to adopt the district court's reasoning and conclude that, in this case, whatever "symbolic link" might in fact be created by the [funding statute's] disbursement of funds to religious institutions is not sufficient to justify striking down the statute on its face.

108 S.Ct. at 2576–2577. Similar to the funding program at issue in *Bowen*, the degree of any "symbolic link" created by the PSEOA program is insufficient to justify striking down the statute on its face. Both the statute challenged in *Bowen* and the PSEOA provide funding through church affiliated organizations for the benefit of secondary school age students. This fact did not alter the Court's rejection of the "symbolic link" argument in *Bowen*, and accordingly will not do so here.

Plaintiff relies on *Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), where the Court invalidated the use of public funds to pay for teaching state-required subjects at parochial schools in part because of the risk of creating "a crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the school." *Id.* at 385, 105 S.Ct. at 3223. *Grand Rapids* is inapplicable to this case. The Court rejected the symbolic link argument in its more recent opinion in *Bowen*. Moreover, students receiving benefits under the statute challenged in *Grand Rapids* were secondary *and* primary students whereas the students receiving benefits under the PSEOA are less impressionable eleventh and twelfth grade secondary students accepted at the CUs on the basis of demonstrated maturity. *See also Board of Education of the West Side Community Schools v. Mergens*, — U.S. —, —, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (O'Connor, J., plurality opinion) ("secondary school students are mature enough and are likely to understand that a school does not endorse or support students' [religious or philo-

sophical] speech that it merely permits on a nondiscriminatory basis.... '[T]he few years difference in age between high school and college students [does not] justif[y] departing from [a prior college establishment clause decision]' ") (citations omitted).

### C. Entanglement

*Bowen* also controls the court's analysis of the facial validity of the PSEOA under the entanglement prong of the *Lemon* test. The Court in *Bowen* upheld the facial validity of a funding program which required the Secretary of Health and Human Services to monitor the use of funds directly granted to religiously affiliated organizations for the purpose of educating adolescents in self-discipline, and other prudent approaches to the problem of adolescent premarital sexual relations, and to promote adoption as an alternative. 108 S.Ct. at 2572, 2579. With respect to the entanglement prong of the *Lemon* test the Court stated the following:

Most of the cases in which the Court has divided over the "entanglement" part of the *Lemon* test have involved aid to parochial schools; in *Aguilar v. Felton*, for example, the Court's finding of excessive entanglement rested in large part on the undisputed fact that the elementary and secondary schools receiving aid were "pervasively sectarian" and had " 'as a substantial purpose the inculcation of the religious values.' " In *Aguilar*, the Court feared that an adequate level of supervision would require extensive and permanent on-cite monitoring, and would threaten both the "freedom of religious belief of those who [were] not adherents of that denomination" and the "freedom of ... the adherents of the denomination."

Here, by contrast, there is no reason to assume that the religious organizations which may receive grants are "pervasively sectarian" in the same sense as the Court has held parochial schools to be. There is accordingly no reason to fear that the less intensive monitoring involved here will cause the government to

intrude unduly in the day-to-day operations of the religiously affiliated ... grantees. Unquestionably, the Secretary will review the program set up and run by the ... grantees, and undoubtedly this will involve a review of, for example, the educational materials that the grantee proposes to use. The Secretary may also wish to have government employees visit the clinics or offices where AFLA programs are being carried out to see whether they are in fact being administered in accordance with statutory and constitutional requirements. But in our view, this type of grant monitoring does not amount to "excessive entanglement," at least in the context of a statute authorizing grants to religiously affiliated organizations that are not necessarily "pervasively sectarian."

*Id.* at 2578 (quoting *Aguilar v. Felton*, 473 U.S. 402, 409–413, 105 S.Ct. 3232, 3236–3239, 87 L.Ed.2d 290 (1985)) (citations omitted). Similar to the funding program considered in *Bowen*, the PSEOA does not cause money to flow to parochial schools. Therefore, as held in *Bowen*, there is no reason to *assume* that the religious organizations which may receive grants are "pervasively sectarian" in the same sense that the Court has held parochial schools to be. The monitoring required under the PSEOA, which amounts to the Minnesota Department of Education reviewing course titles and possibly attending a few classes, is less intensive than that required under the statute at issue in *Bowen* which required the Secretary to review educational materials and visit clinics or offices where church affiliated organizations were teaching adolescents about the sensitive topic of premarital sexual relations and abortion. Since the Court in *Bowen* held such monitoring to not constitute excessive entanglement, this court must also hold that the monitoring required under the PSEOA does not amount to excessive entanglement. Both programs provide funding to religious organizations for the education of adolescents. Neither program provides funding to parochial schools. Both programs neutrally cause funds to go to public and private organizations. Accordingly, the court holds that the PSEOA, on its face, does not cause excessive entanglement.

## II. As Applied

### A. *Purpose, Effect and Bowen's Directive on Entanglement*

The more difficult question in this case is whether the PSEOA, as applied, violates the establishment clause. Again, there is no question that the PSEOA has a legitimate secular purpose. Whether the PSEOA, as applied, has the effect of advancing or inhibiting religion, or creates an excessive entanglement with religion, are questions which require careful consideration. In *Bowen*, the Court remanded the case to the district court for reconsideration of the validity of the statute as it is applied with the following instructions:

[I]t will be open to appellees on remand to show that [the statute's] aid is flowing to grantees that can be considered "pervasively sectarian" religious institutions, such as we have held parochial schools to be.... It is not enough to show that the recipient of a challenged grant is affiliated with a religious institution or that it is "religiously inspired."

The district court should also consider on remand whether in particular cases [the statute's] aid has been used to fund "specifically religious activit[ies]" in an otherwise substantially secular setting." In *Hunt*, for example, we deemed it important that the conditions on which the aid was granted were sufficient to preclude the possibility that funds would be used for the construction of a building used for religious purposes. Here it would be relevant to determine, for example, whether the Secretary has permitted [the statute's] grantees to use materials that have an explicitly religious content or are designed to implicate the views of a particular religious faith.... Evidence that the views espoused on questions such as premarital sex, abortion, and the like happen to coincide with the religious views of the [statute's] grantee would not be sufficient to show that the grant funds are being used in

such a way as to have a primary effect of advancing religion.

If the district court concludes on the evidence presented that grants are being made by the Secretary in violation of the establishment clause, it should then turn to the question of the appropriate remedy.... Should the court conclude that the Secretary has wrongfully approved certain ... grants, an appropriate remedy would require the Secretary to withdraw such approval.

*Id.* 108 S.Ct. at 2580–2581 (quoting *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973)). It is prudent for this court to analyze the validity of the PSEOA as it is applied in accordance with the Court's instructions.

A significant distinction exists between the PSEOA and the statute challenged in *Bowen.* Public funds provided under the PSEOA indirectly flow to church affiliated organizations whereas the funding program challenged in *Bowen* directly granted funds to church affiliated organizations. This distinction is particularly significant because when the Court has analyzed the validity of funding programs which it found to indirectly aid religious organizations it did not examine the nature of the religiously affiliated institutions. *See Witters,* 474 U.S. at 490, 106 S.Ct. at 753; *Mueller,* 463 U.S. at 399, 103 S.Ct. at 3069; *Blanton,* 434 U.S. at 803, 98 S.Ct. at 39, *summarily aff'g,* 433 F.Supp. 97 (M.D. Tenn.1977). It is clear under *Witters* and *Mueller* that, so long as the funding statute causes funds to flow neutrally to both public and private organizations, and the funds flowing to private organizations result from the independent choices of numerous individual beneficiaries, the statutory program will be upheld under the second prong of the *Lemon* test regardless of the sectarian nature of the institutions ultimately receiving the funding. The institutions receiving indirect funding in *Mueller* were parochial schools with characteristics similar to others that had been held pervasively sectarian. 463 U.S. at 391, 103 S.Ct. at 3065. Similarly, the funds provided under the statute challenged in *Witters* went to a Christian bible college to pay for training of the person receiving funds to become a minister. 474 U.S. at 483, 106 S.Ct. at 750. Since this Court concludes that the PSEOA indirectly provides funds to church affiliated institutions, *Mueller* and *Witters* require it to also conclude that, as the statute is applied, the PSEOA avoids the second prong of the *Lemon* test regardless of how sectarian the institutions receiving aid are.

■ This conclusion has little practical effect, however, because the Court's directive in *Bowen* requires examination of the sectarian nature of institutions receiving aid under the third, or entanglement prong of the *Lemon* test. 108 S.Ct. at 2577–78. Neither *Mueller* nor *Witters* examined the sectarian nature of institutions receiving aid under that prong. In *Witters,* the Court remanded the entanglement analysis to the Washington Supreme Court, 474 U.S. at 486 n. 3, 106 S.Ct. at 751 n. 3, and in *Mueller* the Court held that the provision of tax deductions to parents would not cause excessive entanglement without examining the nature of the schools receiving aid. 463 U.S. at 403, 103 S.Ct. at 3071. The PSEOA requires greater monitoring of the use of funds than was required in *Witters, Mueller,* or *Blanton.* Accordingly, because of the unique nature of the PSEOA, as distinguished from any previous funding statute the Supreme Court has considered, and the Court's directive in *Bowen,* to survive the entanglement prong of the *Lemon* test the defendant institutions in this case must not be pervasively sectarian.

### B. The Meaning of Pervasively Sectarian

The Court has struck down a public funding statute because it found the institutions receiving aid "pervasively sectarian" in only four cases. *See Aguilar v. Felton,* 473 U.S. 402, 411–12, 105 S.Ct. 3232, 3237–38, 87 L.Ed.2d 290 (1985); *Grand Rapids School District v. Ball,* 473 U.S. 373, 384–85, 105 S.Ct. 3216, 3222–23, 87 L.Ed.2d 267 (1985); *Wolman v. Walter,* 433 U.S. 229, 250, 97 S.Ct. 2593, 2606, 53 L.Ed.2d 714 (1977); *Meek v. Pittenger,* 421 U.S. 349,

366, 95 S.Ct. 1753, 1763–64, 44 L.Ed.2d 217 (1975). The Court has specifically found institutions not "pervasively sectarian" in five cases. *See Committee for Public and Religious Liberty v. Regan*, 444 U.S. 646, 661, 100 S.Ct. 840, 850, 63 L.Ed.2d 94 (1980); *Roemer v. Maryland Public Works Board*, 426 U.S. 736, 758–59, 96 S.Ct. 2337, 2350–51, 49 L.Ed.2d 179 (1976); *Hunt v. McNair*, 413 U.S. 734, 744, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973); *Tilton v. Richardson*, 403 U.S. 672, 681, 91 S.Ct. 2091, 2097, 29 L.Ed.2d 790 (1971); *Board of Education v. Allen*, 392 U.S. 236, 248, 88 S.Ct. 1923, 1929, 20 L.Ed.2d 1060 (1968). CU's have never been held to be pervasively sectarian. *See Roemer*, 426 U.S. at 757, 96 S.Ct. at 2350; *Hunt*, 413 U.S. at 744, 93 S.Ct. at 2874; *Tilton*, 403 U.S. at 682, 91 S.Ct. at 2097.

The nine cases dealing with pervasive sectarianism trace a line that is difficult to follow. Over the years since the concept's inception, its meaning has shifted depending on which Justices were able to obtain enough votes to draft the decisive opinion. The following constitutes a historical summary of the decisions in an attempt to ascertain where the Court stands today. In 1968, the Court first applied the effect test to the public funding context. With regard to the sectarian nature of the parochial schools receiving the aid, Justice White, writing for a 6–3 majority stated, "parochial schools are performing, in addition to their sectarian function, the task of secular education.... We cannot agree with appellants either that all teaching in a sectarian school is religious or that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion." *Board of Education v. Allen*, 392 U.S. 236, 248, 88 S.Ct. 1923, 1929, 20 L.Ed.2d 1060 (1968). Three years later, this statement was specifically relied on in *Lemon* and *Tilton*. *See Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) ("In *Allen* the Court acknowledged that secular and religious teachings were not necessarily so intertwined that secular textbooks furnished students by the state were in fact instrumental in the teaching of religion.... We

have no quarrel with this conclusion"); *Tilton v. Richardson*, 403 U.S. 672, 681, 91 S.Ct. 2091, 2097, 29 L.Ed.2d 790 (1971) ("[In *Allen*] the Court refused to assume that religiosity in parochial elementary and secondary schools necessarily permeates the secular education that they provide."). The Court in *Tilton* used the statement as an argument that, since primary and secondary schools have a separable, secular educational function, so too do church affiliated colleges and universities. *Tilton*, 403 U.S. at 681, 91 S.Ct. at 2097.

*Tilton* is the case attributed with creating the "pervasively sectarian" refinement to the effect test: an institution has the primary effect of advancing religion if "religion so permeates the secular education provided by church-related colleges and universities that their religion and secular educational functions are in fact inseparable." *Id.* at 680, 91 S.Ct. at 2097. Justice Burger's plurality opinion emphasized certain aspects of the parties stipulation as showing that the four Catholic CUs involved were not pervasively sectarian:

(1) that courses taught at these institutions are taught according to the academic requirements intrinsic to the subject matter and the individual teacher's concept of professional standards;

(2) although appellants introduced several institutional documents that stated certain religious restrictions on what could be taught, other evidence showed that these restrictions were not in fact enforced;

(3) that the schools were characterized by an atmosphere of academic freedom rather than religious indoctrination;

(4) all four institutions subscribe to the 1940 Statement of Principles on Academic Freedom and Tenure endorsed by the American Association of University Professors and the Association of American Colleges.

*Id.* at 681–82, 91 S.Ct. at 2097–98. The Court also considered significant that "college students are less impressionable and less susceptible to religious indoctrination." *Id.* at 686, 91 S.Ct. at 2099.

After *Tilton*, treatment of the pervasively sectarian test was clear: neither the primary or secondary Catholic schools in *Allen* were pervasively sectarian in the sense that their secular educational functions were inseparable from their sectarian functions nor did the record in *Tilton* show that the four Catholic CUs involved were pervasively sectarian.

In *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), decided two years later, a 6–3 majority of the Court restated the pervasively sectarian test in the following manner:

Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission.

*Id.* at 743, 93 S.Ct. at 2874. The majority opinion examined the following factors under this test:

(1) that the members of the College Board of Trustees are elected by the South Carolina Baptist Convention,

(2) the approval of the Convention is required for certain financial transactions,

(3) the charter of the College may be amended only by the Convention,

(4) there are no religious qualifications for faculty membership or student admission, and,

(5) only 60% of the College student body is Baptist, a percentage roughly equivalent to the percentage of Baptists in that area of South Carolina.

*Id.* at 743–44, 93 S.Ct. at 2874. Consistent with *Allen, Lemon* and *Tilton*, a majority of the Court held that an institution of higher education with these features was not pervasively sectarian. *Id.*

Two years after deciding *Hunt*, the Court decided *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). There the Court faced three statutory programs granting aid to mostly Catholic primary and secondary schools: (1) a textbook loan program essentially identical to the one involved in *Allen*, (2) an "instructional materials and equipment" loan program, and (3) an auxiliary teaching program whereby public school teachers taught secular courses on private school grounds. *See id.* The Court invalidated the third program on entanglement grounds. *See id.* at 367–73, 95 S.Ct. at 1764–67.

The Court upheld 6–3 the first program because it was identical to *Allen*. *See id.* at 359–62, 95 S.Ct. at 1760–62. Justice Stewart, writing for Blackmun, Powell, Rehnquist, Burger and White, provided the following rationale: "the record in the case before us, like the record in *Allen*, contains no suggestion that religious textbooks will be lent or that the books provided will be used for anything other than purely secular purposes." *Meek v. Pittenger*, 421 U.S. at 361–62, 95 S.Ct. at 1761. Justices Brennan, Marshall and Douglas dissented. The stated rationale presumes, as the Court had presumed in *Allen*, that the primary and secondary (primarily Catholic) schools involved had a separable, secular educational function to which the loaned textbooks would be put.

In dealing with the second program the Court created a standard difficult to square with its prior ruling. Justices Stewart, Blackmun, and Powell, after holding textbooks can be loaned for a separable, secular purpose, held that materials and equipment cannot be loaned for secular purposes because Catholic primary and secondary schools are so pervasively sectarian that "the secular education those schools provide goes hand in hand with the religious mission that is the only reason for the school's existence." *Id.* at 366, 95 S.Ct. at 1764. The Court provided no explanation for its inconsistency. This marked the first time the Court specifically held Catholic primary and secondary schools pervasively sectarian. The Court provided no analysis of what characteristics of the institutions involved led it to this conclusion.

In 1976 the Court decided *Roemer v. Maryland Public Works Board*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179. Justice Blackmun wrote the plurality opinion. Blackmun's opinion provides the most detailed examination of factors used to determine whether an institution is pervasively sectarian. In addition to the factors con-

sidered in *Hunt,* Justice Blackmun considered as relevant to a pervasively sectarian determination the characteristics Justice Burger had considered in his plurality opinion in *Tilton* under the entanglement analysis. *Roemer,* 426 U.S. at 758 n. 21, 96 S.Ct. at 2350 n. 21. He also added a number of new factors the district court had looked at. *Id.* at 756–57, 96 S.Ct. at 2349–50. These factors are identified below in the summary of all factors considered by the Court. Only two Justices joined in Blackmun's opinion, both of whom have since been replaced.

Justice White, joined by Rehnquist, concurred in the judgement and wrote a separate opinion. From White's dissenting opinion in *Lemon* and this opinion, he and Rehnquist's position can be fairly summed up by quoting the following passage:

It is enough for me that the states and the federal Government are financing a separable secular function of overriding importance in order to sustain the legislation here challenged. That religion and private interests other than education may substantially benefit does not convert these laws into impermissible establishments of religion.

*Lemon v. Kurtzman,* 403 U.S. 602, 664, 91 S.Ct. 2105, 2136–37, 29 L.Ed.2d 745 (1971); *see also Roemer,* 426 U.S. at 768, 96 S.Ct. at 2355.

Neither White nor Rehnquist have ever adopted a strict "pervasively sectarian" analysis and it is fair to conclude from their opinions that so long as some secular subject or activity can be identified, no matter how minute, aid to that function would be justified. Under their view, examination of the nature of the institution is quite limited.

Justices Brennan, Marshall and Stevens also make their positions clear in *Roemer* through a dissenting opinion by Justice Brennan:

I believe that the Establishment Clause forbids ... Government to provide funds to sectarian universities in which the propagation and advancement of a particular religion are a function or purpose of the institution.... I do not believe that

[direct] grants to such a sectarian institution are permissible. The reason is not that religion 'permeates' the secular education that is provided. Rather, it is that the secular education is provided within the environment of religion; the institution is dedicated to two goals, secular education and religious instruction. When aid flows directly to the institution, both functions benefit.

*Roemer,* 426 U.S. at 771–72, 96 S.Ct. at 2356–57 (quoting *Lemon,* 403 U.S. at 659–60, 91 S.Ct. at 2134). From this it is apparent that, for these three justices, all church affiliated CUs are pervasively sectarian. That is so because to be church affiliated means "the propagation and advancement of a particular religion are a function or purpose of the institution." The only way for a religiously affiliated CU not to have funding taken away under these justices' view is to break all ties with the affiliated Church. If their view was that of a majority of the Court, there would be no question that the PSEOA as applied to the defendant colleges would violate the establishment clause.

The mode of analysis Justice Blackmun follows falls between these two diametrical approaches, with a slight leaning towards the approach of Brennan, Marshall and Stevens. *Compare Roemer,* 426 U.S. at 756–57, 96 S.Ct. at 2349–50, *with Bowen,* 108 S.Ct. at 2582–2597.

In *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the Court was confronted with seven programs granting aid to primary and secondary schools. Two of them were almost exactly the same as the first two considered in *Meek.* The Court split the same way that it had in *Meek* on these two programs, with Justice Stevens replacing Justice Douglas in the dissent. Justice Blackmun, writing for the Court, recognized the inconsistency created in *Meek* and attempted the following explanation: "There is, as there was in *Meek,* a tension between this result and *Board of Education v. Allen. Allen* was premised on the view that the educational context of textbooks is something that can be ascertained in advance and cannot be

diverted to sectarian uses." *Wolman v. Walter,* 433 U.S. at 251 n. 18, 97 S.Ct. at 2607 n. 18 (citations omitted). This explanation is a distinction without a difference. Just as the overhead projector sought to be loaned in *Meek* and *Wolman* can be used to make a religious point, so too can a secular textbook on science be used to make a religious point when a teacher contrasts the written secular idea with a religious view. In neither case can that use be ascertained in advance. More important for purposes of the instant case, this analysis does not explain how primary and secondary parochial schools can be "pervasively sectarian" and thus not capable of using a projector in a secular manner, and at the same time have a separable secular function in which text books can be used.

Justice Blackmun explains that he merely follows *Allen* for stare decisis reasons, but adheres to "principles announced in subsequent cases." *Id.* The principles presumably are that primary and secondary schools with characteristics like those in *Wolman* are "pervasively sectarian" and that CUs with characteristics like those in *Tilton, Hunt* and *Roemer* are not.

The Court in *Wolman,* as the Court in *Meek,* neglected to specifically identify those characteristics of the primary and secondary schools involved which led it to hold them pervasively sectarian. In the facts section of the opinion, however, the Court noted a number of aspects of Catholic schools which representative officials had stipulated that they would testify to:

(1) that such schools operate under the general supervision of the Bishop of their diocese;

(2) that most principals are members of a religious order with the catholic church;

(3) that a little less than one-third of the teachers are members of such religious orders;

(4) that "in all probability a majority of the teachers are members of the Catholic faith";

(5) that many of the rooms and hallways in these schools are decorated with a Christian symbol;

(6) that all such schools teach the secular subjects required to meet the state's minimum standards;

(7) that the state mandated five-hour day is expanded to include, usually, one-half hour of religious instruction;

(8) that pupils who are not members of the catholic faith are not required to attend religion classes or to participate in religious exercises or activities;

(9) that no teacher is required to teach religious doctrine as a part of the secular courses taught in the schools; and

(10) that none of the schools covered by the statute discriminate in the admission of pupils or in the hiring of teachers on the basis of race, creed, color, or national origin.

*Id.* at 234, 97 S.Ct. at 2598.

The Court's listing of these aspects and the subsequent conclusion "of the impossibility of separating the secular education function from the sectarian," *id* at 250, 97 S.Ct. at 2607, indicates that an institution carrying these characteristics would be held pervasively sectarian and therefore ineligible for any form of direct financial aid.

Three years after *Wolman,* in *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980), a 5–4 majority opinion by Justice White appeared to again shift the meaning of the phrase "pervasively sectarian." Justices Stewart and Powell joined White, Burger, and Rehnquist, to hold that state payments to non-public primary and secondary schools for expenses incurred in exercising certain state required reporting and testing requirements did not violate the establishment clause. *Id.* The important point of White's opinion relevant here is that he discounts the principal that aid "to even secular educational functions of a sectarian school is forbidden." *Id.* at 661, 100 S.Ct. at 850.

Stewart and Powell apparently defected from the rationale they supported in *Wolman* and *Meek* that Catholic primary and secondary schools were "pervasively sectarian." Justice Blackmun, in his dissent, implicitly accuses them of such inconsistent defection from the *Wolman* and *Meek* opin-

ions they had joined. *Id.* at 664, 100 S.Ct. at 852. ("Now, some of those who joined in ... *Meek* and *Wolman* in invalidating, depart and validate. I am able to attribute this defection only to a concern about the continuing and emotional controversy and to a persuasion that a good-faith attempt on the part of a state legislature is worth a nod of approval."). Thus *Regan* appeared to thoroughly reinstate the view held before *Meek* was decided that Catholic primary and secondary schools *were not* pervasively sectarian and therefore aid could be given to a separable, secular part of such schools.

After *Regan*, whether a primary or secondary school with the characteristics set forth in *Wolman* was "pervasively sectarian" was difficult to determine. Brennan, Marshall and Stevens held that all Catholic primary and secondary educational institutions were "pervasively sectarian"; for them any degree of church affiliation rendered an institution pervasively sectarian. Blackmun would join their opinion if the schools possessed the characteristics found in *Wolman.* White, Burger and Rehnquist held a statute constitutional so long as there was a separable, secular function of a parochial school that the aid was directed to, and for Burger, no entanglement. Which side Stewart and Powell would fall on was unclear.

Four years later, after Justice O'Connor replaced Justice Stewart, the Court decided *Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), and *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), two primary and secondary school establishment clause cases.

Justice Brennan, joined by Marshall, Blackmun and Stevens, wrote for the Court in both cases. In *Grand Rapids* Brennan emphasized the opinion of these four justices: Catholic primary and secondary schools with the following four characteristics are pervasively sectarian:

(1) include prayer and attendance at religious services as a part of their curriculum,

(2) are run by churches or other organizations whose members must subscribe to particular religious tenets,

(3) have faculties and student bodies composed largely of adherents of the particular denomination,

(4) and give preference in attendance to children belonging to the denomination.

*See Grand Rapids,* 473 U.S. at 384 n. 6, 105 S.Ct. at 3223 n. 6. Therefore, the aid flowing to these schools in the form of auxiliary teacher services "leasing" nonpublic school classrooms and purporting to go to the separable secular educational function has the primary effect of advancing religion. Justices Rehnquist and White submitted dissents attacking the Court's conclusion. *Id.* at 400–401, 105 S.Ct. at 3231. Justice Burger concurred in *Grand Rapids* on entanglement grounds. *Id.* at 398, 105 S.Ct. at 3230. Justice Powell concurred in *Aguilar* stating that the schools under review have inseparable educational functions, *Aguilar,* 473 U.S. at 414–19, 105 S.Ct. at 3238–42, but if the aid arrived at the schools indirectly "we would be presented with a different question." *Id.* at 419, 105 S.Ct. at 3241.

Justice O'Connor's position is unclear. While in *Grand Rapids* she adopts the majority's view that "religion pervades the curriculum," she couples that statement with: "the teachers [here] are accustomed to bring religion to play in everything they teach," before concurring in the judgement. *Grand Rapids,* 473 U.S. at 398–400, 105 S.Ct. at 3230–3231. In *Aguilar,* on the other hand, Justice O'Connor does not even discuss whether religion pervades the curriculum and concludes that there is no primary effect of advancing religion based on an analysis of the statute and its applied history. *Aguilar,* 473 U.S. at 421–31, 105 S.Ct. at 3242–48. Her position regarding the pervasively sectarian test as can be discerned from her opinions in *Grand Rapids* and *Aguilar* is unclear, except that she may take it into account as one factor.

Since *Aguilar* and *Grand Rapids* were decided, Justices Scalia and Kennedy replaced Burger and Powell. The Court then decided *Bowen.* The majority opinion by Justice Rehnquist, joined by Justices

White, O'Connor, Scalia and Kennedy, significantly clarifies the meaning of the phrase "pervasively sectarian." Those five Justices held that even if grantee institutions are religious organizations with (1) explicit corporate ties to a particular religious faith and by-laws, and (2) have policies that prohibit any deviation from religious doctrine, it is insufficient to conclude that the organization is pervasively sectarian. *Bowen,* 108 S.Ct. at 2580 n. 16. "While these factors are relevant ..., they are not conclusive." *Id.* Justices Scalia and Kennedy clearly joined in the White and Rehnquist approach and would go further in diminishing the importance of the pervasively sectarian test.

The Court states that "it will be open to appellees on remand to show that [the statute's] aid is flowing to grantees that can be considered 'pervasively sectarian' religious institutions, such as we have held parochial schools to be." In my view, such a showing will not alone be enough, in an as-applied challenge, to make out a violation of the establishment clause.

Though I am not confident that the term "pervasively sectarian" is a well-founded judicial category, I recognize the thrust of our prior decisions that a statute which provides for exclusive or disproportionate funding to pervasively sectarian institutions may impermissibly ad-

vance religion and as such be invalid on its face. We hold today, however, that the neutrality of the grant requirements and the diversity of the organizations described in the statute before us foreclose the argument that it is disproportionately tied to pervasively sectarian groups. Having held that the statute is not facially invalid, the only purpose of further inquiring whether any particular grantee institution is pervasively sectarian is as a preliminary step to demonstrating that the funds are in fact being used to further religion. In sum, where ... a statute provides that the benefits of a program are to be distributed in a neutral fashion to religious and non-religious applicants alike, and the program withstands a facial challenge, it is not unconstitutional as applied solely by reason of the religious character of a specific recipient. The question in an as-applied challenge is not whether the entity is of a religious character, but how it spends its grant.

*Id.* at 2582.

## C. Application of the Pervasively Sectarian Test to the Defendant CUs

■ Based on the factors gleaned from the cases [3] and an analysis of the attitudes of a majority of the Court with respect to those factors, the court must determine whether a reasonable factfinder could find

---

**3.** The following constitutes a summary of all the factors that the Court has considered in determining whether an educational institution is pervasively sectarian:

A. Factors considered in majority opinions

1. That such school operate under the general supervision of the bishop of their diocese, *Wolman,* 433 U.S. at 234, 97 S.Ct. at 2598

2. That most principals are members of a religious order within the affiliated church, *id.*

3. That a little less than one-third of the teachers are members of a religious order, *id.*

4. That in all probability a majority of the teachers are members of the affiliated church, *id.; Grand Rapids,* 473 U.S. at 384 n. 6, 105 S.Ct. at 3223 n. 6

5. Many of the classrooms and hallways are decorated with a religious symbol, *Wolman,* 433 U.S. at 234, 97 S.Ct. at 2598

6. The state-mandated five-hour day is expanded to include one-half hour of religious instruction, *id.; Grand Rapids,* 473 U.S. at 384 n. 6, 105 S.Ct. at 3223 n. 6

7. Non-church affiliated students are not required to attend religious exercises or classes,

*Wolman,* 433 U.S. at 234, 97 S.Ct. at 2598; *Roemer,* 426 U.S. at 758 n. 21, 96 S.Ct. at 2350 n. 21 (citing *Tilton,* 403 U.S. at 686–87, 91 S.Ct. at 2099–2100)

8. No teacher is required to teach religious doctrine as a part of the secular courses taught in the schools, *Wolman,* 433 U.S. at 234, 97 S.Ct. at 2598

9. The schools are run by churches or other organizations whose members must subscribe to particular religious tenets, *Grand Rapids,* 473 U.S. at 384 n. 6, 105 S.Ct. at 3223 n. 6; *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973); *Roemer,* 426 U.S. at 755, 96 S.Ct. at 2349; *Bowen,* 108 S.Ct. at 2580 n. 16

10. The schools' student bodies are composed largely of adherents to a particular faith, *Grand Rapids,* 473 U.S. at 384 n. 6, 105 S.Ct. at 3223 n. 6; *Hunt,* 413 U.S. at 743–44, 93 S.Ct. 2874–75; *Roemer,* 426 U.S. at 757–58, 96 S.Ct. at 2350

11. The schools give preference in attendance to children belonging to the denomination, *Grand Rapids,* 473 U.S. at 384 n. 6, 105 S.Ct. at

that the plaintiff has met his burden of showing that PSEOA aid is flowing to defendants which can be considered "pervasively sectarian." *Bowen v. Kendrick*, 108 S.Ct. at 2580.

### 1. Macalester

Macalester is not pervasively sectarian. Based on the record before the court, no reasonable factfinder could conclude otherwise. Nineteen of the thirty-six factors weigh against a finding that Macalester is pervasively sectarian. Plaintiff has failed to meet his burden of coming forward with evidence with respect to eleven of the factors and four factors are not relevant to Macalester in this case. Only two factors favor a finding of pervasive sectarianism.

Macalester does not operate under the general supervision of a Presbyterian

3223 n. 6; *Hunt*, 413 U.S. at 743–44, 93 S.Ct. at 2874–75; *Roemer*, 426 U.S. at 758, 96 S.Ct. at 2350

12. The governing church elected all members of the board of trustees, *Hunt*, 413 U.S. at 743–44, 93 S.Ct. at 2874–75; *Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349

13. The governing church retained all power to approve certain financial transactions, *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2874; *Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349

14. The governing church retained all power to amend the colleges' charter, *Hunt*, 413 U.S. at 743–44, 93 S.Ct. at 2874–75; *Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349

15. The Parent Handbook of one school states the goals of education as "[a] God oriented environment which permeates the total educational program," "[a] Christian atmosphere which guides and encourages participation in the church's commitment to social justice," and "[a] continuous development of knowledge of the Catholic faith, its traditions, teachings and theology." *Grand Rapids*, 473 U.S. at 379, 105 S.Ct. at 3220 (citation omitted); *Bowen*, 108 S.Ct. at 2580 n. 16.

B. Additional factors from plurality opinions

16. The students are college students and thus less impressionable, *Tilton v. Richardson*, 403 U.S. 672, 685–86, 91 S.Ct. 2091, 2099–2100, 29 L.Ed.2d 790 (1971) (strictly speaking, this factor was not considered under a pervasively sectarian analysis in *Tilton* but instead under an entanglement "character of the institutions" inquiry. Nevertheless, the Court's most recent decision in *Bowen* appears to equate these two forms of inquiry; for this reason, this court will consider the level of impressionableness of students as an additional factor under the pervasively sectarian test)

17. The institutions subscribe to the 1940 statement of Principles on Academic Freedom and Tenure endorsed by the American Association of University Professors and the Association of American Colleges, ("1940 statement of Principles of Academic Freedom"); this means that courses are taught according to the academic requirements intrinsic to the subject matter and the individual teachers concept of professional standards, *Roemer*, 426 U.S. at 756, 96 S.Ct. at 2349; *Tilton*, 403 U.S. at 681, 91 S.Ct. at 2097

18. There was evidence that there were certain restrictions on what could be taught, but also evidence that such restrictions were not enforced, *Tilton*, 403 U.S. at 681, 91 S.Ct. at 2097

19. The colleges are characterized by a high degree of institutional autonomy, *Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349

20. The colleges do not receive funds from or make reports to their affiliated church, *id.*

21. No instance of church considerations into college decisions is shown, *id.*

22. The colleges employ church affiliated chaplains, *id.*

23. The colleges hold church affiliated religious exercises on campus, *id.*

24. The encouragement of spiritual devotion is only one secondary objective, *id.*

25. At none of the colleges does encouragement for spiritual devotion go beyond providing opportunities or occasions for religious experience, *id.*

26. Religious indoctrination is not a substantial purpose or activity, *id.*

27. Mandatory religion or theology courses are taught at each of the colleges, primarily by Roman Catholic clerics, but these only supplement a curriculum covering the spectrum of a liberal arts program, *id.* at 756, 96 S.Ct. at 2349

28. Some classes are begun in prayer, *id.*

29. Such prayer is not required but treated as a facet of a professor's academic freedom, *id.*

30. Persons not members of the affiliated church are admitted as students and given faculty appointments, *id.* at 758 n. 21, 96 S.Ct. at 2350 n. 21 (citing *Tilton*, 403 U.S. at 686–87, 91 S.Ct. at 2099–2100)

31. Theology courses cover a range of human experience and are not limited to courses about the religion, *id.*

32. Apart from the theology department, faculty hiring decisions are not made on a religious basis, *id.* 426 U.S. at 757, 96 S.Ct. at 2350

33. The school introduced evidence that they made no attempt to proselytize, *id.* at 758 n. 21, 96 S.Ct. at 2350 n. 21 (citing *Tilton*, 403 U.S. at 686–87, 91 S.Ct. at 2099–2100)

34. Some of the required courses are taught by Rabbis, *id.*

35. The Court in *Roemer* found that mandatory theology or religion courses are taught with a taint of religious indoctrination, *id.* 426 U.S. at 758 n. 21, 96 S.Ct. at 2350 n. 21, the Court in *Tilton* found the opposite, *id.*, neither found the schools involved were pervasively sectarian

36. Some instructors wear clerical garb, *id.* 426 U.S. at 756, 96 S.Ct. at 2349

church leader. (Affidavit of Robert Gavin at para. 10). Classrooms are not decorated with religious symbols. Classroom religious instruction is not a daily requirement at Macalester. Students are not required to attend religious exercises. Teachers are not required to teach religious doctrine as part of secular courses. No preference in attendance is given to Presbyterian students. Only one of thirty-two trustees is a church official. Macalester's prospectus expressly provides that it welcomes people of many religions and beliefs.

The factor regarding the impressionability of students also favors Macalester, and all of the defendants in this case. The cases relied on by plaintiff to support his contention that this factor weighs in his favor involved both secondary *and* primary school students. *See* plaintiff's Memorandum in Support of Summary Judgment at 16, 26 (citing *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987); *Grand Rapids School District v. Ball*, 473 U.S. at 383, 105 S.Ct. at 3222). Here, not only are the students from the top two grades of secondary schools, but it is undisputed that each participating defendant will only accept students that demonstrate enhanced maturity and talent. *See* Presidents' Affidavits, *supra* note 2. Under these unique circumstances, the court concludes that the students benefiting from the PSEOA are more like the college students considered less impressionable in *Tilton*, 403 U.S. at 685–86, 91 S.Ct. at 2099–2100, than the secondary and primary school students considered in *Edwards* and *Grand Rapids*. This conclusion is strengthened by the plurality opinion in *Board of Education of the Westside Community Schools v. Mergens*, — U.S. —, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) where Justice O'Connor stated:

"We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student [religious or philosophical] speech that it merely permits on a non-discriminatory basis.... '[T]he few years difference in age between high school and college students does not justify departing from [a prior college establishment clause decision]'"
*Id.* at —, 110 S.Ct. at 2372.

There are no religious restrictions on what can be taught at Macalester. Macalester receives no funding from the Presbyterian Church. No instance of church considerations into college decisions is shown. Religious indoctrination is not a substantial activity. There are no mandatory theology courses taught. No classes are begun with prayer. Persons not members of the Presbyterian church are admitted as students and given faculty appointments. Faculty hiring decisions are not made based on creed. Macalester introduced evidence that it makes no attempt to proselytize.

Plaintiff has come forward with no evidence regarding factors 2, 3, 4, 9, 10, 13, 14, 19, 24, 25 and 36. Factors 31, 34 and 35 are not relevant because PSEOA students are not permitted to take theology or religion courses. Only factors 22 and 23 favor a finding that Macalester is pervasively sectarian. Factor 29 is also not relevant.[4] Based on the foregoing, defendants' motion for summary judgment must be granted to the extent that it requests the court to

---

**4.** As explained in the text accompanying footnote 3 *supra* the court has applied various factors gleaned from Supreme Court establishment clause cases to the defendant institutions in the present case. By specifically enumerating 36 different factors that the Supreme Court has relied on in determining whether other institutions are pervasively sectarian the court does not mean to imply that establishment clause analysis can be distilled into simple mathematics. The court recognizes that while the Supreme Court has considered a total of 36 different factors in a number of cases, the Court has not considered all 36 factors in any single case. Moreover, the court does not mean to suggest that the plaintiff must come forward with evidence on a majority of these 36 elements in order to support a finding that a given institution is pervasively sectarian. Indeed, an institution may be considered pervasively sectarian if only several of the 36 factors apply to it—assuming they are the factors the Supreme Court has considered most crucial as indicated in the historical analysis section above. In sum, the "factor analysis" which the court here undertakes is simply an attempt to apply numerous and diverse Supreme Court opinions, none of which are directly on point, to the case at hand.

conclude that the PSEOA as applied to Macalester does not violate the establishment clause on the basis that Macalester is pervasively sectarian.

### 2. Hamline

Hamline is not pervasively sectarian. Based on the record before the court, no reasonable factfinder could conclude otherwise. Factors 1, 5, 6, 7, 8, 11, 12, 15, 16, 17, 18, 21, 26, 27, 28, 30, 32 and 33 weigh against a finding of pervasive sectarianism; only factors 20, 22 and 23 favor such a finding; the remaining factors are either irrelevant or undeterminable from the record. Accordingly, defendants' motion for summary judgment must be granted to the extent that it requests the court to conclude that the PSEOA as applied to Hamline does not violate the establishment clause on the basis that Hamline is pervasively sectarian.

### 3. Augsburg

Augsburg cannot reasonably be considered pervasively sectarian. Factors 1, 5, 6, 7, 8, 11, 16, 17, 18, 21, 26, 27, 29, 30, 32 and 33 weigh against a finding of pervasive sectarianism. Only factors 12, 15, 20, 22 and 23 weigh in favor of such a finding. Plaintiff has failed to come forward with any evidence on factors 2, 3, 4, 10, 13, 14, 19, 24, 25, 28 and 36. The remaining factors are not relevant to Augsburg. Accordingly, defendants' motion for summary judgment must also be granted to the extent that it requests the court to conclude that the PSEOA as applied to Augsburg does not violate the establishment clause on the basis that Augsburg is pervasively sectarian.

### 4. St. Thomas

St. Thomas is not pervasively sectarian. The secular teaching functions at St. Thomas are not inextricably intertwined with the sectarian ones. Sixteen of the thirty-six factors weigh against a finding of pervasive sectarianism at St. Thomas. Plaintiff has not met his burden of coming forward with any evidence with respect to ten of the factors. Only six factors favor a finding of pervasive sectarianism. Four factors are not relevant.

The Archdiocese does not control the core structure or content of the subjects taught at St. Thomas. There is no required one-half hour of religious instruction as found in *Wolman* and *Grand Rapids*. PSEOA students are not required to attend religious exercises or classes. No teacher is required to teach religious doctrine as a part of the secular courses taught in the school. St. Thomas does not give preference in attendance to children belonging to the Catholic Church. The Catholic Church did not elect all members of the board of trustees. While 13 percent of the board are church officials, there is no policy at the College of St. Thomas regarding the church affiliation of its board; persons of several religious denominations, as well as persons with no official church membership, serve on the board. (St. Thomas' Answers to Interrogatories at 5). Eleventh and twelfth grade students who are selected by St. Thomas on the basis of enhanced maturity and talent are not significantly more impressionable than were the college students considered in *Roemer, Tilton* and *Hunt*. Courses at St. Thomas are taught according to the academic requirements intrinsic to the subject matter and the individual teacher's concept of professional standards. There is evidence that there are certain restrictions on what can be taught (*see* Affidavit of Roger G. Marks, Exh. 15, p. 5), but also evidence that such restrictions are not enforced. (*See* Affidavit of Terrence Murphy at paras. 11 & 12). No instance of church consideration into college decisions is shown. Religious indoctrination is not a substantial purpose or activity at St. Thomas. St. Thomas provides a variety of liberal arts courses. The president of St. Thomas states in his affidavit that there is no attempt on behalf of St. Thomas to indoctrinate or proselytize students. (Affidavit of Terrence Murphy at para. 16). Prayer is not required at the beginning of classes. Faculty hiring decisions are not made on a religious basis. Non–Catholics are admitted as students and given faculty appointments. PSEOA students are not only not required, but are not permitted, to take religion or theology courses at St. Thomas. This factor makes

irrelevant three other factors which have been considered by the Supreme Court in *Roemer;* namely, the nature of the theology courses, by whom they are taught, and whether they have a taint of religious indoctrination.

On the other hand, the president of the college, Terrence Murphy, is a Catholic priest. (St. Thomas' Answers to Interrogatory No. 10; Affidavit of Terrence J. Murphy at para. 1). Some of the classrooms are decorated with religious symbols and some instructors wear religious garb. The college admission statement contained in its handbook provides that St. Thomas is committed to the total development of the student through a liberal arts education in the Catholic tradition and that its Catholicism encompasses both curricular and noncurricular matters. The college employs church affiliated chaplains and holds church affiliated religious exercises on campus.

Plaintiff has failed to present any evidence on the percentage of teachers at St. Thomas that are members of a religious order or are members of the Catholic Church; and the percentage of students that are members of the Catholic Church is unclear. There is also insufficient evidence in the record for a reasonable factfinder to find in plaintiff's favor with respect to factors 9, 13, 14, 19, 24, 25 and 28.

The court concludes that St. Thomas is not pervasively sectarian within the meaning of *Grand Rapids, Aguilar, Regan, Roemer, Hunt, Tilton, Wolman,* and *Meek.* No reasonable factfinder could find otherwise. Accordingly, the court concludes as a matter of law that the PSEOA as applied to St. Thomas does not violate the establishment clause on the grounds that St. Thomas is pervasively sectarian.

### 5. St. John's

St. John's is also not pervasively sectarian. Its secular teaching function is not inextricably intertwined with its sectarian functions. After reading through the portion of the record related to the sectarian nature of St. John's, the court finds that it is essentially the same as the sectarian nature of St. Thomas, and accordingly concludes that the PSEOA as applied to St. John's does not violate the establishment clause on the basis that St. John's is pervasively sectarian.

### 6. St. Catherine

The record before the court demonstrates that the College of St. Catherine is not pervasively sectarian following the same analysis as applied to St. Thomas. One difference is that there are no religious symbols or images in the classrooms where PSEOA students attend classes at St. Catherine. Accordingly, the court's conclusion above with respect to St. Thomas and St. John's applies equally to St. Catherine.

### 7. Concordia

Analysis of whether Concordia is pervasively sectarian is more difficult. Concordia's general catalog for 1985 to 1987 expressly states that "[c]onsidering education in the light of Christ, there can be no division between sacred and secular subjects." (Affidavit of Roger G. Marks, Exh. 18, p. 8). Viewed in isolation that statement would appear to be an admission that Concordia's secular and sectarian functions are "inextricably intertwined." *Bowen* requires examination of more than an institution's policy statement, however. *See Bowen v. Kendrick,* 108 S.Ct. at 2580 n. 16 ("the [lower court] ... identif[ied] ... religious organizations ... that ... have explicit corporate ties to a particular religious faith and [have] policies that prohibit any deviation from religious doctrine.... While these factors are relevant to a determination of whether an institution is 'pervasively sectarian,' they are not conclusive").

Sixteen of the identified factors weigh against a finding that Concordia is pervasively sectarian in the circumstances of this case. There is no showing that Concordia operates under the general supervision of a Lutheran Church minister and the President's affidavit states that the Lutheran Church does not control course structure, content of subjects or restrict how faculty can teach. Paul Dovre, President of Concordia, is not an ordained minister. (Concordia's Answers to Interrogatory No. 10).

There are no religious symbols in Concordia's classrooms. There is no required one-half hour of religious instruction. PSEOA students are not required to attend religious exercises or classes. Concordia does not give preference to PSEOA students belonging to the Lutheran Church. The governing church does not elect *all* members of the board of trustees. The majority of the board of trustees, however, are required to be Lutheran. Concordia subscribes to the 1940 Statement of Principles on Academic Freedom endorsed by the American Association of University Professors, which means that courses are taught according to the academic requirements intrinsic to the subject matter and the individual teacher's concept of professional standards. Students receiving benefits of the PSEOA are less impressionable than those receiving benefits under the statutory program examined in *Grand Rapids.* Although there is evidence that there are restrictions on what can be taught in secular courses in the college's handbook, there is also evidence that such restrictions are not enforced. (Affidavit of Paul Dovre at para. 11: "the ... Lutheran Church does not impose restrictions on how and what faculty can teach at Concordia"). Religious indoctrination is not a substantial purpose or activity at Concordia. Concordia's curriculum encompasses a spectrum of liberal arts classes. (Affidavit of Paul Dovre, paras. 2, 3 & 8). Students and faculty members are not required to attend religious activities. No PSEOA student takes religion or theology courses at Concordia. Prayer is not required or encouraged in classes at Concordia. Faculty hiring decisions are not made on a religious basis. Persons not members of the Lutheran Church are admitted as students and given faculty appointments. Concordia has introduced evidence, through the affidavit of its president, that it makes no attempt to proselytize.

On the other hand, nine factors favor a finding that Concordia is pervasively sectarian. Concordia's general catalog provides that teachers are required to teach religious doctrine as part of the secular courses. Concordia is run by the Lutheran Church. A majority of Concordia's governing board are required to be Lutheran. Concordia's general catalog states that: "[T]he integrating element for the curriculum in life in the liberal arts college of the church is the revelation of God in Jesus Christ ... this concept of our shared life in Christ holds vital implications for Concordia.... Considering education in the light of Christ, there can be no division between sacred and secular subjects." (Affidavit of Roger G. Marks, Exh. 18, p. 8). Concordia receives funds from the Lutheran Church. Concordia employs Lutheran chaplains and holds Lutheran religious exercises on campus. The encouragement of spiritual devotion appears to be a vital objective of Concordia.

Plaintiff has failed to come forward with any evidence to show the percentage of teachers at Concordia that are members of a Lutheran religious order and the percentage of teachers that are members of the Lutheran Church. There is no evidence that the Lutheran Church retained all power to approve certain financial transactions, or to amend Concordia's charter. There is also no evidence of the percentage of students that adhere to the Lutheran faith at Concordia. Nor is there evidence of church denomination of decisions of Concordia College. There is insufficient evidence for the court to arrive at a conclusion regarding the autonomy of Concordia and whether prayer occurs in classes. PSEOA students are not permitted to take theology courses so that the extent to which indoctrination occurs in theology courses is not relevant in this case.

After consideration of all of the factors enunciated by the Supreme Court, the court concludes that Concordia College is not pervasively sectarian. Although Concordia's general catalog provides that "there can be no division between sacred and secular subjects," there is ample evidence in the record to support that in actuality sacred and secular subjects are not "inextricably intertwined." *Bowen* requires this court to look beyond the statements of policy and consider the record as a whole in making its determination as to

the pervasively sectarian nature of institutions receiving funding. Consideration of all the factors on the record before the court, even when viewing the evidence in the light most favorable to plaintiff, leads to one reasonable conclusion: Concordia is not pervasively sectarian. Accordingly, defendants' motion for summary judgment must be granted to the extent that it requests the court to conclude that the PSEOA does not violate the establishment clause in providing funds to Concordia on the basis that Concordia is pervasively sectarian.

### 8. Bethel

■ The most difficult determination in this case is whether a reasonable factfinder could conclude from the evidence presented that Bethel is pervasively sectarian as defined by the Supreme Court. Bethel argues that the Minnesota Supreme Court has already determined this issue in its favor, and that this court should follow that determination. *See* Memorandum of Defendant Colleges at 19, *citing Minnesota Higher Education Facilities Authority v. Hawk*, 305 Minn. 97, 232 N.W.2d 106 (1975). *Hawk*, is inapplicable in the instant case. While the Minnesota Supreme Court in *Hawk* implicitly held that Bethel was not pervasively sectarian, it did so on the basis of a stipulation of facts substantially different from those before the court in this case. *See Hawk*, 305 Minn. at 100–01, 232 N.W.2d at 109. There was no evidence in *Hawk*, as there is here, that Bethel requires all of its students to affirmatively state they are Christian to be admitted, or that concurrence with the major articles of the college's "Affirmation of Faith" is expected for full-time appointment to the faculty.

Based on its review of the record, the court concludes that sufficient genuine issues of material fact exist to preclude summary judgment in favor of either of the parties on the question of whether Bethel is pervasively sectarian. Principal among the material fact issues that remain are the following:

(1) Whether Bethel admits only christian PSEOA and non-PSEOA students. *Compare* Affidavit of George K. Brushaber at para. 15 ("Both PSEOA and non-PSEOA students are admitted without regard to denominational affiliation or sectarian creed") *with* Defendant Bethel College's Admissions of the Genuineness of Documents and Exhibits, Exh. C–1 (students must meet the following minimum standards to be admitted [for the 1985–86 PSEOA program]: ... [a]ffirmative response to "Do You Consider Yourself A Christian?");

(2) Whether all faculty must be Christian. *Compare* Affidavit of George K. Brushaber, para. 9 ("Faculty hiring decisions at Bethel are not made on the basis of sectarian criteria or the applicant's denominational affiliation") *with* Bethel's Answer to Interrogatory 14 ("concurrence with the major articles of the College's 'Affirmation of Faith' is expected for full-time appointment to the faculty").

### D. No Evidence of Funds to Sectarian Functions

The final consideration for this court under *Bowen* is whether plaintiff has come forward with evidence from which a reasonable factfinder can conclude that funds from the PSEOA program have been used for "specifically religious activit[ies] in an otherwise substantially secular setting." *Bowen*, 108 S.Ct. at 2580 (citing *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2874). All of the evidence in the record, except that regarding Bethel, indicates that funds provided to defendant institutions are paid in accordance with the statutory formula solely for the purposes of reimbursing defendants for tuition, costs and fees incurred by them in teaching non-sectarian courses. *See* Presidents' Affidavits, *supra* note 2. Plaintiff has come forward with no evidence to the contrary. Accordingly, defendants' motion for summary judgment must be granted to the extent that it requests the court to conclude that the PSEOA is not unconstitutional as applied to any of the defendant CU's, except Bethel, based on the use of the funds.

### III. Due Process

Plaintiff has also failed to come forward with evidence or argument to support the allegation in his complaint that the Act violates the due process clause of the Constitution. Accordingly, summary judgment must be granted on this claim as well.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is denied.

2. Defendants' motion for summary judgment as to defendants Macalester, Hamline, Augsburg, St. Thomas, St. John's, St. Catherine and Concordia is granted.

3. Defendants' motion as to defendant Bethel is denied.